IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| In re:<br><br>GUNNALLEN FINANCIAL, INC.<br><br>Debtor. | Chapter 11<br><br>Case No. 8:10-bk-9635-MGW |

## DEBTOR'S CHAPTER 11 CASE MANAGEMENT SUMMARY

GUNNALLEN FINANCIAL, INC., ("**GAF**" or the "**Debtor**") by and through its undersigned attorneys, pursuant to Administrate Order FLMB-2009-1, hereby files this Chapter 11 Case Management Summary (the "**Summary**"). For its Summary, the Debtor states the following:

### Introduction

On April 26, 2010 (the "**Petition Date**"), the Debtor filed a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

### Case Management Items

I. **Description of the Debtor's Business**

The Debtor was formerly a broker-dealer engaged in the business of effecting transactions in securities, but has ceased operations and is currently engaged in the windup and liquidation of its business.

The Debtor operated primarily on an independent registered representative model. Prior to ceasing operations, the Debtor had approximately 585 registered representatives,

510 of whom were independent contractors who owned and ran their own businesses, while being licensed through and supervised by the Debtor. The Debtor had 180 branch offices in approximately 37 states, most of which were owned and operated by these independent contractor representatives.

The Debtor was solely an introducing broker-dealer, which meant that GAF brokers took customer orders and placed trades, but the trades were cleared and the securities were held by a clearing broker dealer, Ridge Clearing and Outsourcing Solutions, Inc. ("**Ridge**"). When a customer wrote a check to GAF to purchase securities, the check was therefore never deposited by GAF and never became an asset of the Debtor, but instead was immediately endorsed payable to the order of Ridge. Therefore, although as of the date it ceased operations the Debtor had over 80,000 customer accounts, no customer funds were or are in the possession of the Debtor, as all customer funds were and are held by Ridge.

II. **Location of Debtor's Operations and Whether Leased or Owned**

The Debtor's main business premises are located at 5002 West Waters Ave., Tampa, FL 33634, which is also the Debtor's corporate mailing address. This location is leased from 5002 West Waters Owner, LLC. The Debtor also has three other office facilities, which are no longer operational. They are located at (1) 1800 Second St, #720, Sarasota, Florida (leased from The Spector Building, f/k/a Estate of Ronald L. Spector), (2) 7280 W. Palmetto Park Rd., #160-N, Boca Raton, Florida (leased from Schever International Plaza, Inc.), and (3) One Industrial Way West, Bldg C., Suites J-P and Q, Eatontown, New Jersey (leased from Eatontown, LLC).

III. **Regulatory Framework**

The Debtor was registered with the Securities and Exchange Commission ("**SEC**") as a broker-dealer pursuant to Section 15(b) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). The Debtor was also a member of the Financial Industry Regulatory Authority, Inc. ("**FINRA**"), the self-regulatory organization governing broker-dealers. On April 12, 2010, the Debtor filed Form BDW, Uniform Request Withdrawal from Broker-Dealer Registration with all securities regulators and states, thereby totaling ceasing all securities operations.

As a registered broker-dealer, the Debtor was also required to and did become a member of the Securities Investor Protection Corporation ("**SIPC**"). SIPC insures that its members' customers receive back their cash and securities in the event of a member's liquidation, up to $500,000 per customer for cash and securities. SIPC is a nongovernmental, nonprofit, membership corporation.

Under Rule 15c3-1 of the Exchange Act (the "**Net Capital Rule**"), a broker-dealer is required to have at all times enough liquid assets to promptly satisfy the claims of customers if the broker-dealer goes out of business. Under this rule, broker-dealers must maintain minimum net capital levels based upon the type of securities activities they conduct and based on certain financial ratios. Broker-dealers that do not clear and carry customer accounts can operate with lower levels of net capital.

IV. **Reasons for Filing Chapter 11**

The Debtor's financial difficulties primarily stem from the large number of securities arbitration and litigation claims that have been filed against the Company over

the past several years. There are in excess of 400 such claims. During fiscal year 2009, the Debtor spent in excess of $7.7 million in legal fees alone in defending such claims. As a result, capital infusions had been required over the last several years in order to allow the Debtor to maintain its net capital position.

The Debtor was required by FINRA to curtail securities operations on March 22, 2010, due to FINRA's assessment that the Debtor was not in compliance with the Net Capital Rule. The Debtor was unable to obtain additional capital or otherwise work with FINRA in order to overcome its net capital deficiencies. On April 12, 2010, the Debtor filed Form BDW, Uniform Request Withdrawal from Broker-Dealer Registration with all securities regulators and states, thereby totaling ceasing all securities operations.

The main goals of the Debtor in filing this Chapter 11 will be to confirm a plan of liquidation that will assure a fair distribution of the Debtor's assets to its creditors, but also to establish a claims resolution procedure to resolve the securities arbitration and litigation claims in a fair and cost-effective manner. The Debtor has both errors and omissions ("**E&O**") and directors and officers liability ("**D&O**") insurance coverage that it believes will cover some portion of the existing claims.

The Debtor is aware that, pursuant to §109(d) the Bankruptcy Code, a stockbroker as defined in §101(53A) is eligible to file a Chapter 7 but not a Chapter 11. However, for the reasons set forth herein, the Debtor is not a stockbroker within the meaning of §101(53A) and therefore is eligible to file this Chapter 11.

The term "stockbroker" is defined in §101(53A) as a person –

4

(A) with respect to which there is a customer, as defined in section 741 of this title; <u>and</u>

(B) that <u>is</u> engaged in the business of effecting transactions in securities –

    (i) for the account of others; or

    (ii) with members of the general public, from or for such person's own account.

The term "customer" is defined in §741 to include an:

(A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity –

    (i) for safekeeping;

    (ii) with a view to sale;

    (iii) to cover a consummated sale;

    (iv) pursuant to a purchase;

    (v) as collateral under a security agreement; or

    (vi) for the purpose of effecting registration of transfer; and

(B) entity that has a claim against a person arising out of –

    (i) a sale or conversion of a security received, acquired, or held as specified in subparagraph (A) of this paragraph; or

    (ii) a deposit of cash, a security, or other property with such persons for the purpose of purchasing or selling a security.

The term "claim" means "any right to payment, whether or not… disputed [or] undisputed." 11 U.S.C. §101(5). It is broadly construed. E.g., In re Piper Aircraft Corp., 58 F.3d 1575 (11th Cir. 1995).

While the Debtor may arguably still have "customers" as of the Petition Date because there will be possible "claims" – a broadly defined term – based on prior transactions, the Debtor does not meet the second test of §101(53A)(B) because, as of the Petition Date and for some time prior to the Petition Date, it was not engaged in the business of effecting transactions in securities.

The legislative history of § 109(d) provides some guidance as to its purpose:

> Stockbrokers and commodity brokers, which are permitted to be debtors under chapter 7, are excluded from chapter 11. The special rules for treatment of customer accounts that are the essence of stockbroker and commodity broker liquidations are available only in chapter 7. Customers would be unprotected under chapter 11. The special protective rules are unavailable in chapter 11 because their complexity would make reorganization very difficult at best, and unintelligible at worst. The variety of options available in reorganization cases make it extremely difficult to reorganize and continue to provide the special customer protection necessary in these cases.

This liquidating Chapter 11 does not present the above-described concerns about the difficulty of reorganizing. In addition, the concerns that gave rise to the enactment of §109(d) are not present here because customer accounts are not held by the Debtor and therefore were never at risk.

If a stockbroker liquidation is initiated by a broker-dealer, SIPC may file an application for a protective decree under the Securities Investor Protection Act of 1970

("**SIPA**") to stay all proceedings to allow SIPC to complete the liquidation of a stockbroker debtor that is a member of SIPC. The Debtor, through its regulatory counsel, has been in contact with SIPC prior to this Chapter 11 filing, and SIPC indicated that it would not attempt to file such an application or otherwise intervene in this bankruptcy.

V. **List of Officers and Directors and Their Salaries and Benefits at Time of Filing and During the One Year Prior to Filing**

Frederick O. Kraus, Jr., President and Chief Financial Officer, currently serves as the sole officer and director of the Debtor. Mr. Kraus receives compensation of $184,992.91 per year. Mr. Kraus also receives other benefits generally available to all employees, including the reimbursement of ordinary business-related expenses.

In the one year prior to filing, the following former officers and directors received annual salary as set forth below:

| Employee Name | Year | Officer/Director | Job Title | Department | Division | Annual Pay Rate |
|---|---|---|---|---|---|---|
| BENDERT, SCOTT J. | 2009 | Officer and Director | CFO | Accounting | Office of CFO | $199,992.21 |
| FRUEH, RICHARD A. | 2009 | Officer and Director | CEO | Executive Office | Executive Office | $488,641.09 |
| GUNN Jr., DONALD J. | 2009 Officer and Director. 2010 Director only | Officer and Director | President | Captive Brokers | Cap Brokers | $131,999.92 |
| JARVIS, DAVID H. | 2009 | Director | General Counsel | Legal | Legal | $225,000.00 |

VI. **Debtor's Annual Gross Revenues**

Upon information and belief, the Debtor's gross revenues for the fiscal year ended December 31, 2009 were approximately $114,000,000.

VII. **Amounts Owed to Various Classes of Creditors**

7

The Debtor's largest secured creditor is Leaf Funding, Inc. ("**Leaf**"). On information and belief, Leaf asserts claims against the Debtor in the amount of approximately $476,428.00**,** and Leaf has filed a UCC-1 financing statement (pursuant to an assignment of the original UCC-1 filed by its predecessor in interest, Netbank Business Finance), asserting an interest in accounts, chattel paper, instruments, goods, motor vehicles, inventory, etc. UCC-1 financing statements have also been filed by CIT Technology Financing Services, Inc., Canon Financial Services, De Lage Landen Financial Services, Inc., Cisco Systems Capital Corporation, American Express Business Finance, CT Lien Solutions, DDI Leasing, Inc., US Bancorp, and General Electric Capital Corporation with respect to various equipment leases and/or financing transactions.

With respect to potential priority claims, the Debtor owes certain payroll obligations which are discussed below.

The Debtor's unsecured claims total approximately $26 million.

VIII. **General Description and Approximate Value of the Debtor's Current and Fixed Assets**

The Debtor's assets consist primarily of equipment, furniture and fixtures, computers and computer software, and accounts receivable, which, on information and belief, have a total value of approximately $2,533,487.20.

IX. **Number of Employees and Amount of Wages Owed as of Petition Date**

As of the Petition Date, the Debtor employed approximately 36 individuals. The Debtor's semi-monthly payroll, which is to be paid on April 30, 2010, will be

approximately $98,702.88, $49,351.44 of which relates to prepetition wages. The Debtor owes payroll taxes for the last payroll period in the amount of $12,142.42, which are due on April 30, 2010. The Debtor will also owe payroll taxes for this payroll.

X. **Status of Debtor's Payroll and Sales Tax Obligations**

The Debtor does not owe any money for sales tax. The amounts owed for payroll taxes are discussed in Section VIII.

XI. **Anticipated Emergency Relief Within 14 Days of Petition Date**

The Debtor anticipates filing the following motions requesting emergency relief or ex parte relief within 14 days of the Petition Date:

1. Motion to Enforce Stay Against Utility Companies;
2. Motion to Pay Prepetition Employee Wages and Benefits;
3. Motion for Authority to Use Cash Collateral; and
4. Motion for Order Authorizing the Maintenance and Use of Existing Bank Accounts and the Continued Use of Existing Business Forms on an Interim Basis.

WHEREFORE, the Debtor respectfully submits this as its Case Management Summary.

                                        */s/ Becky Ferrell-Anton*
                                        Harley E. Riedel
                                        Florida Bar No. 183628

Becky Ferrell-Anton
Florida Bar No. 0449342
STICHTER, RIEDEL, BLAIN &
 PROSSER, P.A.
110 Madison Street - Suite 200
Tampa, Florida 33602
(813) 229-0144
(813) 229-1811 FAX
bfanton@srbp.com
Attorneys For Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **Case Management Summary** has been furnished on this 28th day of April, 2010, by the Court's CM/ECF electronic mail system to the Office of the Assistant U.S. Trustee.

*/s/ Becky Ferrell-Anton*
Becky Ferrell-Anton