UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:
GUNNALLEN FINANCIAL, INC.,            Case No. 8:10-bk-9635-MGW
          Debtor.                               Chapter 11 Case
_____/

**UNITED STATES TRUSTEE'S MOTION TO
AUTHORIZE THE APPOINTMENT OF A CHAPTER 11 TRUSTEE,
OR ALTERNATIVELY, TO CONVERT CASE TO A CASE UNDER CHAPTER 7**

Donald F. Walton, the United States Trustee for Region 21, by and through the undersigned counsel, hereby requests that the Court enter an order authorizing the appointment of a Chapter 11 Trustee, or alternatively, converting the above-styled case to a case under Chapter 7 pursuant to 11 U.S.C. §§ 1104 and 1112(b), and states:

**I. INTRODUCTION**

1. On the Petition Date, the Debtor's cash balance was $1,171,226.97. Debtor has dissipated over $400,000 within one reporting period, making payments to professionals who are not employed by the estate and payments to pre-petition creditors without this Court's authority. As of May 31, 2010, Debtor's cash balance was $834,552.31, and continues to diminish post-petition. The Debtor's dissipation of assets evidences a continuing loss to and/or diminution of the estate. Further, there are significant insider transactions that create a conflict for the Debtor's sole remaining officer and director to appropriately advise Debtor's counsel. Debtor's unauthorized post-petition transfers coupled with several pre-petition transfers and insider transactions evidence gross mismanagement and conflicts of interest before and after the filing of the Chapter 11 case, and constitute grounds for appointment of a Chapter 11 Trustee, or dismissal or conversion under 11 U.S.C. §§ 1104 and 1112(b).

## II. PROCEDURAL BACKGROUND AND FACTUAL ALLEGATIONS

### A. Background

2. GunnAllen Financial, Inc. (the "Debtor") is a broker-dealer that began its operations around 1996 and entered liquidation mode in March 2010.

3. The Debtor is a Florida Corporation. The Debtor is a wholly-owned subsidiary of GunnAllen Holdings, Inc. ("GunnAllen Holdings" or "GAH"). Other subsidiaries of GunnAllen Holdings, include but may not be limited to, GunnAllen Tax Services, Inc., Westshore Asset Management, LLC., GunnAllen Home Loans, Inc., Pointe Capital, LLC., and GAF Insurance Services, Inc. The majority shareholder (with over 75% of the stock) of GunnAllen Holdings is Hyde Park Equity Investments, LLC., an entity controlled by John H. Sykes. The remaining interest is held by a variety of shareholders including Donald J. Gunn, Jr. and Richard A. Frueh.

4. The Debtor, GAH, and GAH's subsidiaries, and related entities operated from the 5002 W. Waters, Tampa, Florida location.

5. Beginning in about 2007, a substantial number of the Debtor's customers began filing litigation and arbitration proceedings against the Debtor, its parent company GAH, the Debtor's officers and directors, and a number of the Debtor's registered representatives and other individuals, alleging numerous violations of federal securities laws and regulations. These actions allege, among other things, that the registered representatives engaged in unauthorized trades, churned customer accounts, made unsuitable investments (including investments in allegedly fraudulent private placements), and fraudulently purchased "fictitious securities" – i.e., securities that did not exist. By the time this case commenced, customers had filed more than 400 such actions against the Debtor, involving roughly 62 of the Debtor's registered

representatives and other individuals.

6. The Debtor contends that during fiscal year 2009 alone it spent more than $7.7 million in legal fees defending these customer claims.

7. On or about December 2, 2009, GAH conducted a board of directors' meeting, after which, the GAH's directors resigned from its board, except Donald J. Gunn, Jr., who remains the sole director of the holding company.

8. Between December 2, 2009 and March 31, 2010, all of the Debtor's officers and directors resigned, except Frederick O. Kraus, Jr., who remains as the Debtor's sole officer and director.

9. On or about March 19, 2010, the Financial Industry Regulatory Authority ("FINRA") notified the Debtor that it was in a net capital deficiency position, and if not resolved, the Debtor would open for business on March 22, 2010 as net liquidation only status until the deficiency was corrected.

10. On March 22, 2010, the Debtor opened for business in net liquidation status, and then notified registered representatives that they must find another broker-dealer with whom to associate. Therefore, the Debtor ceased operations of its business as of March 22, 2010.

12. On April 26, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code.

13. On the Petition Date, the Debtor's sole officer and director was Frederick O. Kraus, Jr., who currently serves as the Debtor's president and chief financial officer.

14. The decision to file this Chapter 11 case on behalf of the Debtor was made by Frederick O. Kraus (the sole officer and director of Debtor), John H. Sykes, through his attorney

(as majority shareholder of GunnAllen Holdings), and Donald H. Gunn, Jr (sole board member of GunnAllen Holdings).

15. Frederick O. Kraus, Donald J. Gunn, Jr. and John H. Sykes are named defendants in arbitration and/or court actions taken by the Debtors' customers.

16. On May 24, 2010, the United States Trustee conducted and concluded the Meeting of Creditors. At the Meeting of Creditors, Mr. Kraus testified on behalf of the Debtor.

### B. Dissipation of Estate Assets

#### *1. Unauthorized Payment of Professionals and Pre-Petition Creditors*

17. On the Petition Date, the Debtor's beginning cash balance was $1,171,226.97. The Debtor's cash balance as of May 31, 2010 was $834,552.31. The Debtor has disbursed over $422,000 in a short span of time, making unauthorized payments to professionals and pre-petition creditors, including over $148,000 plus to various professionals not employed by the estate, $1,085 to the Standard Coffee Company, $1,806 to Professional Reliable Onsite Shredding for shredding papers, $3,277 to Sprint for Blackberries, and $2,491 to Wolf Executive Search and the Goliath Group for recruiting fees.

18. The Monthly Operating Report (the "MOR") for the period of April 26, 2010 through May 31, 2010 provides numerous examples of the Debtor's unauthorized payments professionals and other pre-petition creditors, including:

   a. A $24,000 payment to Deborah Williams on May 10, 2010 pursuant to a "custodian contract" that has not been assumed by the Debtor or approved by the Court.

   b. A $26,750 payment to Grant Thornton, LLP on April 26, 2010 for audit services, which either were performed pre-petition, or were performed post-petition without Court approval. Grant Thornton was also paid $85,000 within the 90 day period prior to the Petition Date.

4

c.  A $10,038.50 payment to Adams & Reese LLP on April 28, 2010 for legal services, which either were performed pre-petition, or were performed post-petition without Court approval.

d.  A $2,594.20 payment to Myers & Shaw, P.A. on May 3, 2010 for "HR legal work," which either was performed pre-petition, or was performed post-petition without Court approval.

e.  A $3,000.00 payment to Kirkland, Russ, Murphy & Tapp on April 28, 2010 for federal and state tax professional services, which either were performed pre-petition, or were performed post-petition without Court approval.

f.  A $17,150 payment to Jay Israel for "debt collection" services, which either were performed pre-petition, or were performed post-petition without Court approval. Jay Israel also received over $51,000 within the 90 day period before the Petition Date.

g.  The following two recruiting fees, which either arose pre-petition or were incurred post-petition without Court approval: (I) a $1,851.24 payment to The Goliath Group on April 29, 2010; and (ii) a $640.00 payment to Wolf Executive Search on April 27, 2010.

h.  A $8,333.33 payment to Performance Cleaning Group on April 26, 2010 for building cleaning services, which either were performed pre-petition, or were performed post-petition without Court approval (and without any equivalent benefit to the estate).

i.  A $5,773.19 payment to TW Telecom on May 11, 2010 for internet/cable services, which appear to have been provided pre-petition, or would have been incurred post-petition without any equivalent benefit to the estate.

j.  A $4,566.72 payment to Level 3 Communications, LLC on April 26, 2010 for phone services, which appear to have been received pre-petition.

k.  A $3,277.04 payment to Sprint on April 26, 2010 for "GAF Blackberries," which appears to have been for pre-petition services (or, if post-petition, would be excessive and unnecessary in light of the fact that all business operations have been terminated).

l.  Various payments for stock quotes, trades and trading services, which appear to be for pre-petition services (since these payments occurred very early in the case and the Debtor allegedly has had no business operations since the filing). These payments include: (I) a $4,277.44 payment to NASDAQ Stock Market, Inc. on

5

April 26, 2010 for stock quotes; (ii) a $1,237.20 payment to Pink OTC Markets, Inc. on April 29, 2010 for trading services; (iii) a $6,854.00 payment to Quodd Financial Information Services on April 29, 2010 for trading services; (iv) a $120.00 payment to Knight Bondpoint, Inc. on April 29, 2010 for trades/quotes; (v) a $1,125.00 payment to EZE Castle Transaction Services, LLC on April 27, 2010 for "Yelensky trade service;" (vi) a $800.00 payment to Tradeweb Markets LLC-Equities on April 28, 2010 for a trading service; (vii) a $200.00 payment to Bondtrac, Inc. on April 27, 2010 for "NJ Trade service;" and (viii) a $56.88 payment to MSRB (Municipal Securities Rulemaking Board) on April 28, 2010 for stock quotes.

m. The following two payments to Standard Coffee Service for coffee, which appear to be based on pre-petition deliveries (or would be grossly excessive if post-petition in light of the few remaining employees): (I) a $316.18 payment on April 29, 2010, and (ii) a $768.92 payment on May 10, 2010.

A copy of the relevant portion of Debtor's Monthly Financial Report is attached as UST's Exhibit 1.

## 2. *Transfer of Servicing of Accounts – The May 14th Letter*.

19. A regular part of the Debtor's business was to assist its customers in investing directly in various third-party products, such as mutual funds, variable annuities, and life insurance policies. The Debtor never held any of these directly-held assets for its customers; rather, the assets were held by the selling third-party fund or institution on behalf of the customer. The Debtor's role (or the role of the registered representative) was to provide ongoing services to the customer related to the directly-held account (including redemptions and additional acquisitions).

20. In exchange for these services, the Debtor would be paid, usually on a quarterly basis, a fee (called a "**12b-1 fee**")[1] or other payment (called a "**trail**") from these types of assets of the account, which in most cases, was calculated as a percentage of the account's value.

---

[1] The fees are payable pursuant to Rule 12b-1 of the Investment Company Act of 1940, 17 C.F.R. 270.12b-1.

When sufficient volume exists, the 12b-1 fees and trails paid from these accounts can be quite significant. In addition, the registered representative servicing the account often is able to enhance the customer relationship and generate further business and revenues for the Debtor.

21. Once a broker-dealer files a BDW with regulators to deregister (which the Debtor did on April 12, 2010), the firm is typically no longer entitled to fees or trails. When FINRA directed the Debtor to cease operations at the end of March 2010, Debtor's management instructed registered representatives how to block transfer all of their directly-held accounts to their new firms. A block transfer is usually accomplished by (I) the registered representative obtaining the customer's affirmative consent to transfer the account to the new firm, (ii) the prior firm giving the necessary customer account information to the new firm (once the customer consents), and (iii) the new firm notifying the third-party fund or institution of the account transfer, which then allows the new firm to begin receiving all applicable 12b-1 fees and trails.

22. When the Debtor ceased operations, it held approximately 66,000 direct accounts with positive balances. Since the end of March 2010, registered representatives have been contacting customers and taking the necessary steps to transfer accounts to their new firms. The U.S. Trustee does not yet know how many accounts have been transferred, or when any transfers occurred. What is clear is that customers have been contacted and efforts to transfer the accounts have been underway for nearly three months. No disclosure of the existence or transfer of these accounts was set forth n any of the Debtor's filings.

23. In addition, it is likely that at least 10,000 directly-held accounts remained with the Debtor as of mid-May, several weeks after the Petition Date. Although it is unclear at this time who actually mailed it (or paid for the mailing), a letter was sent to roughly 10,000

customers on May 14, 2010 notifying them that their accounts would be transferred to either Daniel Ortega or David Levine, both of whom were previously affiliated with the Debtor. (*See* UST's Exhibit 2. Mr. Ortega was the Debtor's Assistant Director of Supervision, who reported directly to Mr. Kraus as Executive Vice President and Director of Supervision. Mr. Ortega was also listed as an employee on the Debtor's first day *Motion to Pay Salary* (Dkt. No. 10), indicating that he was with the Debtor on the Petition Date. All of the Debtor's branch managers reported to Mr. Ortega and Mr. Kraus. Mr. Levine served as the Debtor's Senior Vice President, Financial Products and Services. Mr. Levine was Mr. Kraus's peer, and both reported to the Chief Operating Officer, Chris Frankel. Mr. Levine oversaw marketing, direct products and insurance. Both Mr. Ortega and Mr. Levine are now affiliated with National Securities Corp.

24. The May 14th letter does not seek the customer's express consent to the transfer. Instead, it gives them 15 days (from the date of the letter) to "opt out." The letter advises customers to send any objection "to the firm that directly holds your account." No mailing information or other instructions are provided. The U.S. Trustee does not know at this time whether any customers objected to the account transfer within the required time.

### C. Pre-Bankruptcy Transfers, Preferential Payments, and Insiders Transactions Create Conflicts of Interest.

25. Prior to the Petition Date, the Debtor (through current and former insiders) engaged in a series of transfers and insider dealings, including but not limited to the following transactions:

    a. ***The Pointe Capital Purchase and Sale***. Pointe Capital was a broker-dealer based on Boca Raton, Florida. In September 2009, GAH purchased Pointe Capital for $1.2 million. The source of funds to purchase Pointe Capital is

unclear. After the December 2, 2009 GAH's board of directors meeting, where substantially all the directors resigned, JHS Investments (an entity controlled by John H. Sykes, a GAH board member) purchased Pointe Capital from GAH for the purchase price of approximately $1.6 Million. One million dollars of the sales proceeds was deposited into the Debtor's account, and $600,000 was a credit towards the purchase price to address a bridge loan between John H. Sykes and GAH. Pointe Capital is now operating under the business name of JHS Capital Advisors. The timing of the acquisition, the source of the purchase price, and resale of this asset need to be evaluated to ensure arms length independence in all aspects of the transactions.

b. ***Debtor's Transfer/Assignment of Rent Deposits and Accrual to GAH.*** During 2008, the Debtor transferred and/or assigned its rent deposit of $1.5 million and rent accrual of $654,000 to GAH. The consideration for this transfer from the Debtor to GAH is unknown.

c. ***The $1.4 million setoff.*** Shortly before the Petition Date, the Debtor and its landlord, 5002 West Waters Owners, LLC, entered into an agreement which resulted in the landlord exercising a $1.4 million setoff against unspecified claims of the landlord. A Bill of Sale, effective April 1, 2010, was executed in connection with this agreement transferring furniture, fixtures and equipment to the landlord to effect the setoff.

d. ***Debtor's Transfer of broker loans to GAH***. In the regular course of conducting its broker-dealer operations, the Debtor from time to time made forgivable loans to its registered representatives as an incentive for the registered representatives to transfer their book of business to the Debtor. If the registered representatives performed successfully over time, the broker loan would be forgiven. If, however, the registered broker did not perform or was no longer associated with the Debtor, then the Debtor could collect on its loan to the registered representative. In early 2009, the Debtor transferred its broker loans, with a carrying value of $797,000, to GAH. It is unclear whether the Debtor received consideration for this transfer.

e. ***Management Fees from Debtor to GAH.*** During 2009, the Debtor transferred about $4.1 million to GAH for "management fees" based on an agreement for the holding company to receive 3.5% of the Debtor's gross revenue. It is not clear whether GAH provided services to the Debtor under this contract that were equal to the value of the funds it received.

It appears that the Debtor had been historically absorbing costs properly attributed to GAH and other non-debtor subsidiaries. Not until November 1, 2009, pursuant to an Addendum to the Management Agreement titled "Occupancy & Equipment Agreement" did GAH agree to accept allocated

9

occupancy and equipment charges from the Debtor. However, there is nothing to substantiate that GAH's and other non-debtor subsidiaries (who all shared the same location) actually paid their share of the costs for occupancy and equipment.

  f. ***2010 Loan from Debtor to GAH.*** During the first four months of 2010, the Debtor loaned $541,000 to GAH. During the same time period, the Debtor had a net loss of about $417,000.

  g. ***Transfer of Debtor's Assets.*** Statement 10 of the Statement of Financial Affairs shows substantial quantities of furniture and computers were sold to Bobby D'Andria for $2,000 on April 1, 2010, and a separate batch to John Nowel on April 12, 2010 for $2,000. Bobby D' Andrea headed up the Debtor's corporate office in Eatontown, New Jersey. John Nowel headed up the Debtor's corporate office in Sarasota, Florida . The transfer price may have been below wholesale or liquidation values.

### D. Incomplete and Inaccurate Schedules and Statement of Financial Affairs

26. Schedule A list no real property.[2] Schedule B shows personal property totaling $4,891,149.28 consisting of bank accounts, accounts receivable, office furnishings and equipment, and leasehold improvements. There were several categories of assets (stock, warrants, intellectual property, causes of action, and customer list) listed with "undetermined" value.

27. Schedule D lists one creditor holding a secured claim in the amount of $476,428. Schedule E listed no creditors holding unsecured priority claims. Schedule F shows creditors holding general unsecured claims in the amount of $2,860,473.44. The $2.8 million number is grossly understated because over 500 of the Schedule F creditors are listed with claims in "undetermined" amounts, and are also listed as "contingent," "unliquidated," and "disputed."

---

[2] Prior to 2006, GAH, Richard Frueh, and Donald J. Gunn, Jr. owned the real property from which the Debtor operated its business on the Petition Date. The purchaser, and current landlord is 5002 W. Waters Owners, LLC.

28. There were several executory contracts and unexpired leases listed on Schedule G, and no co-debtors were listed on Schedule H.

29. The Debtor's Schedules and Statement of Financial Affairs were not accurate and complete. On May 25, 2010, following the Meeting of Creditors, the United States Trustee requested that the Debtor amend it Schedules and Statement of Financial Affairs to accurately disclose: (1) insurance policies and performance bond(s) in response to Schedule B, item 9, (2) possible commissions owed to former broker-dealer representatives in response to Schedule E, (3) funds the Debtor received other than from operation of its business (i.e., the Pointe Capital sale, funds from related entities, or insiders) in response to Statement 2 of the Statement of Financial Affairs, (4) listing all payments made *on behalf of the debtor* within one year period, including funds paid by GAH in response to Statement 9 of the Statement of Financial Affairs, (5) the last two inventories taken in response to Statement 20 of the Statement of Financial Affairs, and (6) the Debtor's 401k or other pension or retirement accounts in response to Statement 25 of the Statement of Financial Affairs. Additionally, Debtor was asked to amend Statement 3(b) of the Statement of Financial Affairs (the spreadsheet showing the disbursements for the 90 day prior to the Petition Date) to include dates of the transfer. To date, these amendments have not been made.

30. On June 22, 2010 (nearly a month after the Meeting of Creditors), the Debtor filed a single amendment, Amended Schedule F, adding about 435 additional creditors in "undetermined" amounts.

31. Because of the Debtor's "undetermined" designations, the Debtor's *List of Creditors Holding 20 Largest Unsecured Creditors* was inaccurate, which made it difficult to

identify the creditors with the largest claims and to determine which creditors held diverse claims in order appoint a representative Committee of Unsecured Creditors in this case.

### III. ARGUMENT REGARDING APPOINTMENT OF CHAPTER 11 TRUSTEE, OR ALTERNATIVELY, TO CONVERT CASE TO CHAPTER 7

#### A. Appointment of a Chapter 11 Trustee

Section 1104, in relevant part, states:

(a) At any time after the commencement of the case but before confirmation of the plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the Court shall order the appointment of a trustee –
    (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or amount of assets or liabilities of the debtor;
    (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
    (3) if grounds exist to convert or dismiss the case under section 1112, but the court determine the determines that the appointment of a trustee or an examiner is in the best interest of creditors and the estate.

11 U.S.C. § 1104 (2010).

Section 1104(a) of the Bankruptcy Code contains three independent grounds for the appointment of a Chapter 11 trustee. First, the Court shall appoint a trustee for cause, including (but not limited to) fraud, dishonesty, incompetence or gross mismanagement by the debtor. *See* 11 U.S.C. § 1104(a)(1). Second, a trustee is required if the appointment would be in the interests of creditors, equity holders and other interests of the estate. *See* 11 U.S.C. § 1104(a)(2). Finally, a trustee should be appointed if grounds exist to convert or dismiss the case under Section 1112 of the Bankruptcy Code, but the bankruptcy court determines that appointing a trustee would be in the best interests of the creditors and the estate. *See* 11 U.S.C. § 1104(a)(3). The standard of

12

proof is clear and convincing evidence. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S. D. N. Y. 2007).

A Chapter 11 trustee is warranted in this case under *each* of these three provisions – any of which would be sufficient, by itself, to warrant a trustee.

### 1. *Cause Exists to Appoint a Trustee*

Section 1104(a)(1) of the Bankruptcy Code requires the appointment of a Chapter 11 trustee, for cause. Once the court finds that cause exists under Section 1104(a)(1), the appointment of a trustee becomes mandatory; there is no discretion. *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 828-29 (Bankr. S.D. Fla. 2003) (citing *In re Oklahoma Refining Company*, 838 F.2d 1133, 1136 (10th Cir. 1988)). Cause includes, but is not limited to, fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management. *See* 11 U.S.C. §1104(a)(1). Such fraud, dishonesty, incompetence or gross mismanagement may be demonstrated "either before or after the commencement of the case." *Id.* Because the examples of cause in Section 1104(a)(1) are non-exclusive, cause may exist, even in the absence of fraud, dishonesty, incompetence or gross mismanagement. For example, courts have found that cause exists to appoint a trustee when current management suffers from conflicts of interest that interfere with its ability to fulfill its fiduciary duties to the estate. *See SunCruz Casinos*, 298 B.R. at 830; *In re Tahkentitch Tree Farm Partnership*, 156 B.R. 525, 527 (Bankr. E.D. La. 1993).

Although Chapter 11 debtors are generally allowed to remain in control of their assets and business operations as a "debtor-in-possession," the debtor-in-possession has a duty to act as fiduciary for the bankruptcy estate. *In re Eurospark Industries, Inc.*, 424 B.R. 621, 627 (Bankr. E.D. N. Y. 2010) (citations omitted). The debtor-in-possession duties include the duty of care to

13

protect the assets, a duty of loyalty and impartiality to avoid self-dealing, conflicts of interest and appearance of impropriety. *Id.* When a debtor-in-possession is not capable of performing its duties, then the appointment of a Chapter 11 trustee is in the best interest of creditors. *Id.*

In this case, the Debtor has not been able to fulfill its fiduciary duties to protect the assets of the estate and will not be able to avoid conflicts of interest in pursuing pre-petition transfers and insider transactions. Since the filing of the case, current management has not guarded property of the estate. Rather, substantial funds have been paid out to professionals not retained by the estate and pre-petition creditors without authority of this Court. Further, as outlined above, there are extensive pre-petition transfers and insider transactions. Any transfer of assets to or payment of funds for the benefit of insiders, when the debtor is insolvent suggests gross mismanagement, and constitutes further grounds for the appointment of a Chapter 11 Trustee or for conversion to Chapter 7. To the extent that the transfer of Debtor's assets, either pre- or post-petition, constitutes fraudulent and/or preferential transfers, those assets may be recoverable by the estate. However, because of the relationship of the insiders with the Debtor, it is unlikely that they will be pursued. Accordingly, an independent Trustee should be appointed to investigate and pursue any causes of actions.

### 2. *Appointment of the Trustee is in the Best Interest of the Estate.*

The Court possesses broad discretion to appoint a trustee "if such appointment is in the interests of creditors, any equity security holders and other interests of the estate." *See* 11 U.S.C. 1104(a)(2). *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S. D. N. Y. 2007). In determining the "best interest of creditors," some courts have considered factors such as (a) trustworthiness of the debtor, (b) the debtor-in-possession's past and present performance and

prospect for rehabilitation, (c) the confidence or lack thereof of the business community and the creditors in present management, and (d) the benefits derived by the appointment of a trustee, balanced against the costs of appointment. *Id.* at 427. The best interest of creditors test is a flexible one, and the bankruptcy court may authorize the appoint of a trustee under §1104(a)(2) even if no "cause" exists. *Id.* Appointment of a chapter 11 trustee is also in the best interest of the creditors when Debtor's current management's duty of loyalty to the estate is compromised and current management will be unable to impartially investigate, evaluate, and pursue insider claims. *Id.* at 428 (citing *Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*, 11 B.R. 552, 554 (Bankr.W.Va.1981) (concluding that appointment of a trustee was justified where loyalty of debtor's current management was called into question due to competing business interests and potential for intercompany dealings); *In re L.S. Good & Co.*, 8 B.R. 312, 315 *(*Bankr.W.Va.1980) (appointing trustee under § 1104(a)(2) where "[t]he magnitude of the number of intercompany transactions places current management [of the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor].")).

In this case, the consideration of the creditors' interests overwhelmingly supports appointing a Chapter 11 trustee. The trustworthiness of the Debtor is a concern, due, in part, to several questionable pre-petition transfers and insider transactions. Further, the Debtor continues to transfer assets post-petition by making unauthorized payments to professionals and pre-petition creditors. Debtor has also sought to transfer servicing of thousands of directly held

accounts post-petition to insiders, including to Daniel Ortega, who remained on the payroll as of the Petition Date.

Debtor's insiders who made the decision to file this Chapter 11 case (Mssrs. Kraus, Gunn, Jr., and Sykes) are all named defendants in legal actions taken by Debtor's customers. The Debtor is liquidating, and there appears to be no prospect of rehabilitation. There is no confidence in current management by the creditors and the business community, and after a long series of FINRA and various other violations, the Debtor could no longer continue in business. The Debtor's management (including the management of the parent company) resigned their positions before the Debtor was placed in bankruptcy. Moreover, the creditors have lost confidence in existing management to such a degree that the Committee is seeking to have post-petition compensation disgorged. *See* Dkt. No. 122. Accordingly, the Debtor's past and present performance creates a basis for appointment of a trustee. The benefits derived from appointment of a trustee is to stop the continued loss and allow an independent person to liquidate the estate and review pre-petition causes of action with impartiality.

Finally, one of the primary assets in this case (according to the Debtor) is recovery from the D & O policies. An impartial chapter 11 trustee is best suited to liquidate this asset. Clearly, potential defendants in actions on those policies should not be in control of the Debtor.

### *3. Grounds Exist To Convert Or Dismiss This Case Under Section 1112*

Section 1104(a)(3) provides that if grounds exist under Section 1112 to convert or dismiss a Chapter 11 case, but the court determines that the appointment of a trustee is in the best interests of the creditors and the estate, then the court shall order the appointment of a trustee. See 11 U.S.C. § 1104(a)(3). As will be discussed below, in this case, cause for

dismissal or conversion under Section 1112 exists because (I) there has been a substantial and continuing loss to or diminution of the estate and there is no reasonable likelihood of rehabilitating the Debtor, and (ii) the estate has been grossly mismanaged. *See* 11 U.S.C. §1112(b)(4)(A) and (B).

## B. Alternatively, Conversion to Chapter 7

Conversion or Dismissal of chapter 11 cases is governed by 11 U.S.C. § 1112(b). Section 1112(b) was substantially amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Section 1112(b), in relevant part, states:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.
> . . .
> (4) For purposes of this subsection, the term "cause" includes -
>     (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>     (B) gross mismanagement of the estate[.]

11 U.S.C. § 1112 (2010).

Section 1112(b) now mandates, with limited exceptions, that the court convert or dismiss a chapter 11 case where any of the acts or omissions listed in section 1112(b)(4), or other cause, exists. This mandate to convert or dismiss in new section 1112(b) is a substantial departure from the former law, which left dismissal or conversion in the court's discretion. *See In re TCR of Denver*, LLC, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal, such that this Court has no choice, and no discretion, in that it "shall" dismiss or convert a case under Chapter 11 if the

elements for "cause" are shown under 11 U.S.C. § 1112(b)(4)"). There are only two exceptions to mandatory conversion or dismissal in the new section. The first is found in section 1112(b)(1), and it restores the court's discretion over dismissal or conversion in cases involving "unusual circumstances specifically identified by the court." The second exception is found in section 1112(b)(2), which excepts a case from dismissal or conversion where (a) "reasonable justification" exists for the deficiencies in the case, (b) those deficiencies "will be cured within a reasonable period of time," and (c) there is a reasonable likelihood that the debtor will confirm a plan. However, this second exception is inapplicable if cause exists under section 1112(b)(4)(A) (substantial or continuing loss to the estate).

      The facts in this case strongly support conversion to Chapter 7 for cause. Since the Petition Date, the Debtor has dissipated over $400,000, with a substantial amount being paid to professionals whose retention was not approved by this Court and to pre-petition creditors. On or about May 14, 2010 a letter was mailed to thousands of the Debtor's customers notifying them that their accounts would be transferred to either Daniel Ortega (who remained on the Debtor's payroll as of the Petition Date) or David Levine, both of whom were previously affiliated with the Debtor. As noted above, prior to the Petition, the Debtor's management has engaged in several pre-petition transfers and insider transactions. Additionally, there are significant accruing administrative costs by Debtor's counsel and special counsel (with possible duplication of efforts). As one court noted in a similar scenario:

> "In the context of a debtor who has ceased operations and liquidated virtually all of its assets, any negative cash flow – including that resulting only from administrative expenses – effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of [Section 1112(b)(4)(A)]."

*Loop Corp. v. United States Trustee (In re Health Risk Management, Inc.)*, 379 F.3d 511, 516 (8th Cir. 2004) (citing *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994)); *Accord In re Great American Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992) (concluding that chapter 11 debtor's business operations in connection with the construction of a sports arena had essentially ceased provided cause to dismiss or convert case). Accordingly, a Chapter 11 trustee would best serve creditor interests in this case. In the event the Court determines that such appointment is not in the creditors' best interests, then in the alternative, the Court should convert this case to a case under Chapter 7.

## IV. RELIEF REQUESTED

WHEREFORE, pursuant to 11 U.S.C. §§1104 and 1112(b), the United States Trustee moves this Court (i) appoint a Chapter 11 Trustee, (ii) or alternatively, convert the Chapter 11 case to one under Chapter 7 alternatively, and (iii) grant such other and further relief that the Court may deem appropriate.

Dated: June 28, 2010.

Respectfully submitted,
DONALD F. WALTON
United States Trustee, Region 21

By: */s/ Denise E. Barnett*
Denise E. Barnett
Trial Attorney
Florida Bar No. 0090610
501 East Polk Street, Suite 1200
Tampa, Florida 33602
(813)228-2000;(813) 228-2303 facsimile
denise.barnett@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served electronically by CM/ECF transmission on the **28th** day of **June 2010** or by regular United States Mail to the parties listed below on the **29th** day of **June 2010**:

| GunnAllen Financial, Inc. 5002 W. Waters Ave. Tampa, FL 33634 | Harley E. Riedel, Esq. Becky Ferrell-Anton, Esq. Amy Denton Harris, Esq. Stichter, Riedel, Blain & Prosser, P.A. 110 E Madison Street, Suite 200 Tampa, FL 33602-4700 aharris.ecf@srbp.com bfanton.ecf@srbp.com hriedel.ecf@srbp.com | Roberta A. Colton Trenam Kemker P. O. Box 1102 Tampa, FL 33601-1102 racolton@trenam.com |
|---|---|---|
| Local Rule 1007-2 Parties in Interest Matrix | | |

*/s/ Denise E. Barnett*
Attorney